The STATE of Ohio, Appellee,

v.

BONTRAGER, Appellant.

[Cite as *State v. Bontrager* (1996), 114 Ohio App.3d 367.]

Court of Appeals of Ohio,
Third District, Hardin County.

No. 6–95–16.

Decided Oct. 17, 1996.

*Eric L. Overstreet,* Assistant City Law Director, for appellee.

*Scott A. Smith,* for appellant.

*Betty D. Montgomery,* Attorney General, *Jeffrey S. Sutton,* State Solicitor, *Christopher Jones* and *Noelle D. D'Allura,* Assistant Attorneys General, Environment Enforcement Section, Ohio Department of Natural Resources.

SHAW, Judge.

Defendant-appellant brings this appeal from the judgment and sentence of the Hardin County Municipal Court following a no contest plea in which defendant was found guilty of violating Ohio Adm.Code 1501:31–15–11(D), the failure to wear hunter orange while hunting during the deer gun-hunting season. Also charged at the same time was defendant's brother.

Defendant is a member of the Old Order Amish faith in Hardin County, Ohio. On November 28, 1994, defendant was hunting on his father's farmland during the deer gun-hunting season without wearing a hunter-orange-colored hat, cap, vest, or jacket. Defendant claims he was without any of these items because he believed, first, that to wear the hunter orange would cause him to violate his

religious beliefs and second, that hunting on family-owned private property did not require the application of the hunter-orange clothing rule.

After defendant initially entered a not guilty plea, the municipal court judge considered a motion to dismiss on affidavits submitted by defendant, ruled for the state and assigned the matter for trial. Thereafter, defendant changed his plea to no contest and was found guilty of deer gun hunting while not wearing hunter orange. Defendant then filed this appeal, asserting the following assignments of error:

"I. Defendants' convictions for failure to comply with Ohio Administrative Code Section 1501:31–15–11(D) were in violation of the Constitutions of the United States and the State of Ohio;

"A. The trial court erred in failing to dismiss the charges against Defendants for violation of Ohio Administrative Code Section 1501:31–15–11(D) where that regulation imposes a substantial burden upon Defendants' ability to exercise their religion and the regulation is not the least restrictive means of furthering a compelling governmental interest;

"B. The trial court erred in failing to dismiss the charges against Defendants for violating Ohio Administrative Code Section 1501:31–15–11(D) where the regulation does not bear a rational relationship to a legitimate governmental interest;

"C. The trial court erred in failing to dismiss the charges against Defendants for violating Ohio Administrative Code Section 1501:31–15–11(D) where that regulation violates the provisions of Article 1, Section 7 of the Ohio Constitution mandating the General Assembly to enact laws which protect every religious denomination in the peaceable enjoyment of its own mode of public worship."

The specific provisions defendant asserts to have been violated include, first, the First Amendment to the United States Constitution:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."

The second provision is the Section 7, Article I, Ohio Constitution:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. * * * Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the General Assembly to pass suitable laws, to protect every religious denomination in the peaceable enjoyment of its own public worship * * *."

The third provision is Ohio Adm.Code 1501:31–15–11(D):

"It shall be unlawful for any person to hunt deer or coyotes during the primitive weapons deer hunting season, statewide primitive weapons deer hunting

season, or the deer gun season unless such a person is visibly wearing a hat, cap, vest, or jacket that is colored hunter orange."

## I. Free Exercise Under the Ohio Constitution

■ The proper standard to review this regulation is the tripartite test enunciated by the United States Supreme Court and later adopted by the Ohio Supreme Court. This test is first, whether a defendant's religious beliefs are sincerely held; second, whether the regulation at issue infringes upon a defendant's constitutional right to freely engage in the religious practices; and third, whether the state has demonstrated a compelling interest for enforcement of the regulation and that the regulation is written in the least restrictive means. See *Sherbert v. Verner* (1963), 374 U.S. 398, 403–407, 83 S.Ct. 1790, 1793–1796, 10 L.Ed.2d 965, 969–972; *State v. Schmidt* (1987), 29 Ohio St.3d 32, 34, 29 OBR 383, 384–385, 505 N.E.2d 627, 628–629; *State v. Whisner* (1976), 47 Ohio St.2d 181, 1 O.O.3d 105, 351 N.E.2d 750, paragraph one of the syllabus.

### A. The Sincerity of Defendant's Religious Beliefs

■ The test to ascertain the sincerity of defendant's religious beliefs is whether "a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *United States v. Seeger* (1965), 380 U.S. 163, 166, 85 S.Ct. 850, 854, 13 L.Ed.2d 733, 737. Although this is an encompassing definition, satisfaction requires more than a personal or philosophical belief. *Wisconsin v. Yoder* (1972), 406 U.S. 205, 216, 92 S.Ct. 1526, 1533–1534, 32 L.Ed.2d 15, 25–26. The belief at issue here is that the Amish must be separate from this world, not associate with nonbelievers and remain self-sufficient, existing without the intrusion of or reliance on the outside world. Thus, what the non-Amish community views as necessities—cars, indoor plumbing, phones, electricity, or other modern conveniences—are disregarded by the Amish. Another example of this separateness is the Amish practice of refraining from fashionable or brightly colored clothing, in favor of blue or black.

In the case before us, defendant is a practicing member of the Amish religion, has been willing to subject himself to state prosecution, and has maintained this appeal. Further, according to the affidavits submitted by defendant, the wearing of bright colors can lead to sanctions imposed by the church. Thus, the sincerity of defendant's religious belief is not questioned.

### B. The Infringement on Defendant's Right to Free Exercise

■ As stated in *Sherbert, supra*, 374 U.S. at 404, 83 S.Ct. at 1794, 10 L.Ed.2d at 970, when one is forced to "choose between following the precepts of [the] religion and forfeiting [governmental] benefits, on one hand, and abandoning one of the precepts of [the] religion in order to accept work, on the other hand," free

exercise of religion has been impaired. See, also, *Yoder, supra,* 406 U.S. at 218, 92 S.Ct. at 1534–1535, 32 L.Ed.2d at 26–27. In other words, government cannot condition benefits or privileges on conduct which causes an individual to violate religious beliefs.

■ In this case, hunting is clearly a government-sponsored benefit or privilege. It occurs only according to legislative grant, see R.C. 1531.02 (wild animals are owned by the state in trust for the benefit of all persons and such animals may be taken only upon legislative permission), and is a privilege for which the legislature, upon granting, may prescribe the terms and conditions, *State v. Hanlon* (1907), 77 Ohio St. 19, 21, 82 N.E. 662, 663. The state also appears to consider hunting a recreational activity, as one who hunts, traps, fishes, swims, or engages in other recreational pursuits with the permission of another, without paying any fees other than to the state or state agency, is termed a "recreational user." R.C. 1533.18.

However, in *Sherbert, supra,* and subsequent cases applying the *Sherbert* test, it is apparent the interests protected in those cases are not equivalent to the hunting privilege at issue here. In *Sherbert, supra,* 374 U.S. at 406–409, 83 S.Ct. at 1795–1797, 10 L.Ed.2d at 971–974, for instance, the court found that disqualifying Saturday Sabbatarians from state-paid unemployment compensation forced an impermissible modification of religious beliefs. Sherbert had to choose between not observing the Sabbath day and working or observing the Sabbath and risking unemployment without any state benefits as the state considered a Saturday Sabbath observation an absence without "good cause." This decision has been followed in subsequent unemployment compensation cases. See, *e.g., Frazee v. Illinois Dept. of Emp. Sec.* (1989), 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914; *Hobbie v. Unemp. Appeals Comm. of Florida* (1987), 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190; *Thomas v. Review Bd.* (1981), 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624. The *Sherbert* test was also applied in *Wisconsin v. Yoder, supra,* 406 U.S. at 218, 92 S.Ct. at 1534–1535, 32 L.Ed.2d at 26–27, where a compulsory-education mandate was excepted for those of the Old Order Amish faith because following the rule placed the Amish at odds with fundamental principles of their religion and disregarding it imposed state criminal sanctions.

On the other hand, more frequent application of the *Sherbert* test by the Supreme Court has not occurred and, in effect, *Sherbert* has been limited to unemployment compensation claims and *Yoder.* In other situations, the Supreme Court has regularly ruled against free exercise claims. See, *e.g., Lyng v. Northwest Indian Cemetery Protective Assn.* (1988), 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (challenging federal forest service plans); *O'Lone v. Estate of Shabazz* (1987), 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (challenging state prison regulations); *Goldman v. Weinberger* (1986), 475 U.S. 503, 106 S.Ct. 1310,

89 L.Ed.2d 478 (challenging federal military regulations); *United States v. Lee* (1982), 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (challenging federal tax provisions). In sum, these cases show that a finding of some benefit conditioned upon violation of a religious belief applies only to a limited few government-sponsored activities.

In Ohio, only one reported decision specifically addresses the issues in the case before us. In *State v. Swartzentruber* (1989), 52 Ohio Misc.2d 1, 556 N.E.2d 531, an Old Order Amish man was convicted for not wearing hunter orange while deer hunting on the property of another during deer gun-hunting season. The defendant claimed that to wear the orange would violate free exercise of his religion. The court found otherwise, holding that any burden on religion was indirect and incidental because of the recreational nature of the activity. *Id.* at 5, 556 N.E.2d at 534. The court also found the limited time frame in which the hunter orange must be worn, the limited number of deer permitted to be taken within a season, and the inapplicability of the hunter-orange requirement to animals other than deer as support for its indirect and incidental burden holding. *Id.* Upon review of the record, we find the rationale of *State v. Swartzentruber*, *supra*, to be appropriate and persuasive in our approach to this case.

### 1. Hunting is Not a Central Tenet of the Amish Religion

In the case before us, a part of the Amish faith is that they must be self-sufficient and not rely on the outside world for sustenance. In this regard, hunting helps to perpetuate the Amish lifestyle, as does farming and raising livestock, but is not required as part of the religion. Additionally, defendant plainly admits that he hunts for recreation and enjoyment, and, as an added benefit, the hunting that does occur only supplements the family's food supply, rather than serving as a primary food source.

Examples of beliefs which the United States Supreme Court, and at least one federal circuit court, have found to be central to a religion include the Santeria's animal sacrifices as a principal means of devotion, *Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993), 508 U.S. 520, 524, 113 S.Ct. 2217, 2222, 124 L.Ed.2d 472, 484–485 the Native American Church's use of the drug peyote for sacramental purposes, *Emp. Div., Dept. of Human Resources of Oregon v. Smith* (1990), 494 U.S. 872, 874, 110 S.Ct. 1595, 1597–1598, 108 L.Ed.2d 876, 882–883, and the belief of the Rescue Mission, a group of persons in New York unaffiliated with any particular church, of "Christ as Savior," *Sullivan v. Syracuse Hous. Auth.* (C.A.2, 1992), 962 F.2d 1101, 1103.

For the Amish, hunting aids in the belief of self-sufficiency, although it is not the prescribed method to fulfill this principle. Other actions can also serve to meet this belief, such as farming, raising livestock, and bartering for goods.

Statements made by defendant corroborate this distinction. As stated in the affidavit, "I hunt not only for recreation and enjoyment, but also to supplement my families [*sic*] food supply." Apparently, other food sources besides deer are available for defendant's family, and must be utilized, since the hunting regulations permit a maximum of three deer to be taken during a license year. Ohio Adm.Code 1501:31–15–11(K)(8).

Court decisions also support the conclusion that hunting is not a central tenet of the Amish religion. As stated in *Swartzentruber, supra,* 52 Ohio Misc.2d at 5, 556 N.E.2d at 534:

"[N]othing in the defendant's religion compels him to hunt deer. He is not required to hunt deer in order to follow the dictates of the church. Nor is it essential to the Amish way of life. Given the choice between hunting deer lawfully, or following his religion and not hunting deer, the defendant will choose to not hunt deer."

The *Yoder* court found, "[T]he Amish mode of life and education is inseparable from and a part of the basic tenets of their religion—indeed, as much a part of their religious belief and practices as baptism, the confessional, or a Sabbath may be for others." *Yoder,* 406 U.S. at 219, 92 S.Ct. at 1535, 32 L.Ed.2d at 27. Again, education and the other examples are basic beliefs of a religion. In contrast, hunting is not an aspect central to the Amish religion in which one must engage to practice the religion properly.

### 2. The Hunter Orange Regulation is Not a Burden on the Practice of the Amish Religion

Because sufficient accommodations exist within the Administrative Code regulations, the Amish may hunt without wearing the hunter orange. For instance, hunter orange is required only for the deer-hunting primitive weapons, statewide primitive weapons and deer gun-hunting seasons. Ohio Adm.Code 1501:31–15–11(D). In 1995, this accounted for fifteen days. The remainder of the deer-hunting season, the three and one-half months from the first Saturday in October to the following January 31, is devoted to longbow and crossbow hunting, in which hunter orange need not be worn. Thus, defendant can hunt deer with either a longbow or a crossbow for a majority of the hunting season without needing to claim a religious exemption from the hunter-orange requirement. See Ohio Adm.Code 1501:31–15–17(R)(1) through (4).

Furthermore, all other animals may be hunted without invoking the hunter-orange requirement. The regulation at issue in this case applies only to the deer gun-hunting and primitive-weapons seasons. The only other time hunter orange is required when not hunting deer is during the statewide primitive weapons season, when only deer, waterfowl, and coyotes may be hunted. Ohio Adm.Code

1501:31–15–13(C)(4). Otherwise, any animal may be hunted during its season, with a gun, without invoking the hunter-orange requirement. For instance, defendant may hunt game birds, Ohio Adm.Code 1501:31–15–17(D) and (F), fur-bearing animals, Ohio Adm.Code 1501:31–15–17(C), (E), (J) and (M), and wild turkey, Ohio Adm.Code 1501:31–15–17(N) and (O), during their respective hunting seasons. Thus, not only is defendant not precluded from hunting deer, he is not precluded from hunting with guns. The only limitation placed on defendant is the hunter-orange requirement for the fifteen-day deer gun-hunting season. As a result, we cannot conclude that the hunter-orange requirement places any burden on defendant's religious practices.

## C.   The State's Compelling Interest

The final element of the *Sherbert* test is that the state must show a compelling interest for the regulation and the regulation is drafted in the least restrictive manner. Although discussion of this prong is not essential to our decision in light of our finding that there is no burden upon the religion, we believe it is important to address this element because, in our view, the state has inherent and compelling interests supporting the hunter-orange regulation.

A compelling interest is one which has more than a rational relationship to some colorable state interest. *Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 971–972. As stated in *Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533, 32 L.Ed.2d at 25, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." A typical example of the "highest order" type of interest which limits the activities of individuals, religious or otherwise, is a regulation to promote health, safety and the general welfare. *Id.* at 220, 92 S.Ct. at 1535–1536, 32 L.Ed.2d at 27–28.

In this case, the state clearly has compelling interests which are inherent to its police powers and superior to defendant's claim of freedom from the hunter-orange requirement. The state's use of police powers is valid when the regulation bears a real and substantial relation to public health, safety, morals, or general welfare. *Cincinnati v. Correll* (1943), 141 Ohio St. 535, 26 O.O. 116, 49 N.E.2d 412. Besides creating rules through the police powers, the power to prohibit actions exists as well. *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163; *Porter v. Oberlin* (1965), 1 Ohio St.2d 143, 30 O.O.2d 491, 205 N.E.2d 363. Examples of valid uses of the state's police powers include requiring car drivers to wear seat belts, *State v. Batsch* (1988), 44 Ohio App.3d 81, 541 N.E.2d 475, and requiring Amish builders to conform with State Building Code regulations to protect the health and safety of the occupants, *State v. Hershberger* (May 30, 1984), Wayne App. Nos. 1904 and 1905, unreported, 1984 WL 6199. Firearms control is also within the realm of the state's police powers. *Arnold, supra,* 67

Ohio St.3d at 47, 616 N.E.2d at 172; *State v. Nieto* (1920), 101 Ohio St. 409, 413–415, 130 N.E. 663, 664–665.

■ Here, the hunter-orange regulation is clearly a form of firearms control. The logic for upholding the requirement to wear hunter orange while gun hunting for deer is similar to that applied in upholding seat belt requirements. In *Batsch, supra*, 44 Ohio App.3d at 82, 541 N.E.2d at 476, the court found that requiring seat belts while driving often saved the driver's life, improved the safety of other drivers on the road, and reduced the impact on taxpayers because of the lesser long-term care needed in the event of an accident. Overall, because of the impact serious accidents have on public agencies, such as the cost of ambulances, physicians, hospitals, and law enforcement personnel, the regulation validly attempted to improve the health, safety, and general welfare of the state's residents. *Id.*

Like automobile accidents, gun-hunting accidents can have serious, life-threatening ramifications. Wearing hunter orange can protect all persons by making the hunter more visible to other hunters as well as nonhunters. Thus, this regulation is a method, albeit far from foolproof, for the state to prevent accidental shootings of other persons and, in this regard, the regulation serves to protect the public health, safety, morals, and general welfare of those persons.

This regulation is also written in the least restrictive method possible. It is directed only towards deer gun-hunting, and primitive weapons hunting, during a time period when persons can hunt for deer. The regulation does not apply to longbow or crossbow hunting or the hunting of other animals. Moreover, as stated earlier, the hunter-orange regulations provide for alternatives to deer gun-hunting and do not preclude a person of the Amish faith from hunting altogether. For instance, bow hunting is allowed, over a greater time span, without the hunter-orange requirement. If defendant wishes to hunt with a gun, the hunter orange is required only for the popular deer-hunting season. He may still hunt during the hunting seasons of other animals and game birds.

Finally, the fact that defendant was hunting on his father's property and, to his knowledge, no other persons were present on the property are not determinative factors. This is because private property interests are not absolute, and are subject to limitation. See, *e.g., Cent. Motors Corp. v. Pepper Pike* (1995), 73 Ohio St.3d 581, 653 N.E.2d 639 (zoning ordinances); *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.* (1992), 65 Ohio St.3d 510, 605 N.E.2d 66 (building code regulations); *Christensen v. Hilltop Sportsman Club, Inc.* (1990), 61 Ohio App.3d 807, 573 N.E.2d 1183 (nuisance regulations).

In this case, allowing defendant to hunt without wearing hunter orange places him at risk of being shot by another who unknowingly comes onto, or perhaps

even near, the property. Alternately, defendant risks accidentally shooting another whom he assumed to be a deer because he did not realize other persons were on the property. In either circumstance, requiring hunter orange to be worn, while hunting on one's own or another's property, is both a valid protective measure and a reasonable restriction on one's use of property.

## II. Free Exercise Under the Federal Constitution

Turning to defendant's claim that the hunter-orange regulation violates his federal constitutional rights of free exercise of religion, the starting point is that the First Amendment applies to the states by incorporation into the Fourteenth Amendment. *Cantwell v. Connecticut* (1940), 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213. The test to apply to the regulation at issue here is either the test announced in *Smith, supra,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876, or that articulated in the Religious Freedom Restoration Act, Sections 2000bb–2000bb4, Title 42, U.S.Code. In either case, the result reached is consistent with that reached under the Ohio Constitution.

According to *Smith* at 878–882, 110 S.Ct. at 1599–1602, 108 L.Ed.2d at 885–888, a neutral law with general applicability is valid despite the fact the law proscribes conduct the religion does not. In such a case, the Free Exercise Clause does not relieve the person of the obligation to comply with the law. *Smith* involved American Indians seeking unemployment benefits after being fired from their positions for peyote use. The state of Oregon considered peyote use a criminal act, even though the peyote was used for religious ceremonies by the American Indians. Thus, the claim that the law infringed upon the claimants' free exercise of religion was rejected, since an individual's religious beliefs do not excuse compliance with an otherwise valid law prohibiting conduct the state may regulate. *Id.* at 878–879, 110 S.Ct. at 1599–1600, 108 L.Ed.2d at 885–886.

Other cases have found state laws unconstitutional. For example, in *Church of the Lukumi Babalu Aye, supra,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472, an ordinance was written with the purpose of making illegal the animal sacrifices performed by the Santeria church. These sacrifices were performed as a form of devotion. The statute was phrased as a measure preventing cruelty to animals, but many exemptions were also created. These exemptions included provisions permitting cow and hog slaughtering, and killing animals for food preparation. The church brought suit to enjoin the ordinance, claiming the state's asserted use of police powers was in error. The Supreme Court held that the religious exercise rights of the church members were impaired because the ordinance was not a neutral law. *Id.* at 529–546, 113 S.Ct. at 2224–2234, 124 L.Ed.2d at 487–499. The ordinance was passed with only animal sacrifices in mind and not of general applicability, since too many other groups were excepted. *Id.*

■ However, in this case, the administrative rule at issue is more akin to that in *Smith, supra,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876, because the hunter-orange regulation is one of general applicability, violation of which results in a criminal action. The risks of over- or underinclusion are not present, since the state's interest in enhancing the safety of deer hunting and protecting hunters and nonhunters from potential accidents is reasonably related to the hunter-orange requirement. There is also an inherent accommodation within the hunting regulations. Alternate methods and time periods for hunting besides gun hunting which do not require the wearing of hunter orange are provided. Finally, the hunter-orange rule was not created with the intent to exclude any group from participating in hunting. Rather, it applies to all persons engaging in gun hunting for deer.

The second test applicable to the federal Constitution is that of the Religious Freedom Restoration Act. Sections 2000bb–2000bb4, Title 42, U.S.Code ("R.F.R.A."). This statute is Congress' attempt to reinstate the *Sherbert* compelling state interest test, and overturn the *Smith* decision. *Id.* at Sections 2000bb(a)(4) and (b). We note that the constitutionality of this statute may be questionable. See Conkle, The Religious Freedom Restoration Act: The Constitutional Significance of an Unconstitutional Statute (1995), 56 Mont.L.Rev. 39, 60–79. See, also, *Abordo v. Hawaii* (D.Haw.1995), 902 F.Supp. 1220 (R.F.R.A. determined to be constitutional); *Keeler v. Mayor & City Council of Cumberland* (D.Md.1996), 928 F.Supp. 591 (R.F.R.A. determined to be violative of separation of powers principles). However, because the analytical standards of this statute are the same as those used for Ohio free exercise claims, the result reached under the state constitutional analysis and R.F.R.A. is the same in any event.

To conclude, defendant's Ohio constitutional claim is rejected because, although defendant may hold his religious beliefs sincerely, the Ohio Administrative Code hunter-orange regulation does not infringe upon his religious practices, and the state does have inherent compelling interests involved in regulating firearms. The federal constitutional claim fails, as well, for essentially the same reasons. The Ohio Administrative Code regulation comports with both tests in the federal system, since it is a law with general applicability and meets the compelling state interests test of the Religious Freedom Restoration Act. For all the foregoing reasons, defendant's assignments of error are overruled and the judgment and sentence of the Hardin County Municipal Court is affirmed.

*Judgment affirmed.*

THOMAS F. BRYANT, J., concurs.

EVANS, J., concurs separately.

EVANS, Judge, concurring.

I agree with the judgment of the majority, but I write separately for two reasons. First, I am not convinced that the regulation in question does not burden the religious beliefs of the appellant. In my opinion, the record is not adequate to make a determination on that point. The record tells us that appellant hunts for food for his family and for recreation. There is no further evidence in the record from which to conclude that hunting is not a central tenet of the Amish faith or that there are other sources of meat available to appellant's family. The appellant has not met his burden of producing sufficient evidence to show that the regulation in question burdens his religious belief. Appellant does not pass the second step in the *Sherbert* test, and his assignments of error should be overruled on that basis.

I also write separately because I disagree with the majority in their treatment of the state's compelling interest (the third step in the *Sherbert* test). I find nothing in the record that establishes the compelling interest of the state. The prosecution introduced no evidence on this point, and I am not willing to speculate as to the motives of the state. The case can be decided on the failure of the appellant to meet his burden with respect to the second step of the *Sherbert* test. The opinion should stop there rather than engage in speculation as to the compelling interest of the state.

Finally, I would refrain from any statement about the constitutionality of the Religious Freedom Restoration Act. The majority makes the following criticism: "We note that the constitutionality of this statute may be questionable." While other courts and academic commentaries may have examined the Act's constitutionality, the question was not presented or argued to this court. Therefore, such a comment by the majority is advisory in nature and inappropriate.

I would affirm the conviction of the appellant because he failed to introduce sufficient evidence to establish that the regulation in question burdened his religious beliefs.